**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| **ROY FORDYCE,** Individually and as a Representative of a Class of Participants and Beneficiaries on Behalf of the Caliber Holdings LLC Retirement Savings Plan<br><br>        **Plaintiffs,**<br><br>**v.**<br><br>**WAND NEWCO 3, INC. d/b/a CALIBER COLLISION, and DOES 1-10 INCLUSIVE,**<br><br>        **Defendants.** | **Case No. 4:25-cv-00997-ALM** |

## AMENDED CLASS ACTION COMPLAINT

1.      Plaintiff, Roy Fordyce, individually and as representative of a class of participants and beneficiaries of the Caliber Holdings Corporation Retirement Savings Plan (f/k/a Caliber Holdings Corporation Retirement Savings Plan, hereinafter the "Plan") brings this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§1001–1461, against Defendants, Wand Newco 3, Inc (d/b/a Caliber Collision, hereinafter "Caliber") and Does 1-10 (together with Newco, "Defendants") for: (1) breach of ERISA's fiduciary duties; (2) violation of ERISA's prohibited transaction rules; and (3) violation of ERISA's anti-inurement provision.

2.      ERISA requires a fiduciary to act "solely in the interest of participants," to do so with "the care, skill, prudence, and diligence" of a prudent person, "in accordance with the documents and instruments governing the plan," and to refrain from "deal[ing] with the assets of the plan" in its own interest.  29 U.S.C. §§ 1104(a)(1), 1106(a)(1)(D), 1106(b)(1).

1

3.      The Fifth Circuit recognizes these duties as the "highest known to the law." *Bussian v. RJR Nabisco, Inc.,* 223 F. 3d 286, 294 (5th Cir. 2000).

4.      The Supreme Court warns ERISA fiduciaries that they are not immunized from their duties to plan participants when they purport to adhere to a plan document. *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 421 (2014) (explaining that compliance with a plan document does not necessarily mean a fiduciary has discharged its duties with the prudence required under ERISA).

5.      ERISA "Section 1106 supplements [a] fiduciary's general duty of loyalty to the plan's beneficiaries . . . by categorically barring certain transactions deemed 'likely to injure the pension plan.'" *Cunningham v. Cornell Univ.,* 604 U.S. 693, 697 (2025).

6.      As detailed below, instead of prudently and loyally evaluating how to best deploy plan assets that had been forfeited by departing Plan participants, Defendants instead reflexively and exclusively used those forfeitures to benefit Caliber, to the detriment of the Plan and its participants, by applying over $7 million of Plan forfeitures to offset Caliber's contractual obligations to make declared matching contributions to the Plan between 2019-2024, while only using $179,828 to defray Plan expenses. Defendants' unconsidered decision to use the lion's share of Plan forfeitures to benefit Caliber resulted in Plan participants paying over $8 million in Plan expenses to the Plan's third-party service providers, both directly and indirectly, that should never have come out of (or reduced the value of) their accounts. Even more egregious, during the class period the Plan had millions of dollars of leftover forfeitures available at the end of each year that Defendants could have used to defray all of the Plan's expenses even *after* they enriched Caliber with over $7 million in Plan assets.

7.      To remedy these fiduciary breaches, Plaintiff, individually and as representative of a class of participants and beneficiaries of the Plan, brings this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) to enforce Defendants' personal liability under 29 U.S.C. § 1109(a) to make good to the Plan all losses resulting from each breach of fiduciary duty and prohibited transaction and to restore to the Plan any profits made through Defendants' use of the Plan's assets. In addition, Plaintiff seeks such other equitable or remedial relief for the Plan as the Court may deem appropriate. Plaintiff, individually and as representative of a class of participants and beneficiaries of the Plan, also brings the claims under 29 U.S.C. § 1132(a)(3) for appropriate equitable relief.

## JURISDICTION AND VENUE

8.      This Court has exclusive subject matter jurisdiction in this ERISA matter under 28 U.S.C. § 1331 and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001 *et seq*. Defendant Caliber is a citizen of Texas.

9.      This Court has personal jurisdiction over Defendants because their principal place of business is located in the Sherman Division of the Eastern District of Texas, they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

10.      Venue is appropriate in the Sherman Division of the Eastern District of Texas within the meaning of 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.

**PARTIES**

11.     The Plan is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34) that covers eligible employees of Caliber and is subject to the provisions of ERISA pursuant to 29 U.S.C. § 1103(a).

12.     Plaintiff Roy Fordyce is a citizen of the State of Maryland, was previously employed by Caliber during the class period, and was a participant in the Plan during the class period. As such, he is a participant under ERISA § 3(7), 29 U.S.C. § 1002(7).

13.     During the class period, Plaintiff's individual account was charged, and Plaintiff paid expenses attributable to the maintenance and administration of the Investment Funds and the administration of the Plan to the Plan's third-party service providers.

14.     Plaintiff has Article III standing to bring this action on behalf of the Plan because he suffered actual injuries through the diminishment of his individual Plan accounts by administrative expenses that should have been paid for with Plan forfeitures. This injury is fairly traceable to Defendants' unlawful conduct in using Plan forfeitures for their own benefit by offsetting Caliber's contribution obligations when they could have used them for the benefit of the Plan and its participants by defraying administrative expenses, and this harm is likely to be redressed by a favorable judgment providing relief to the Plan.

15.     Having established Article III standing, Plaintiff may seek recovery for the entire Plan under 29 U.S.C. § 1132(a)(2).

16.     Plaintiff and all participants in the Plan did not have knowledge of all material facts (including, among other things, the misallocation of Plan forfeitures) necessary to understand that Defendants breached their fiduciary duties and ERISA's prohibited transaction rules until shortly before this suit was filed.

4

17.     Caliber is the largest provider of automobile collision repair services in the United States and is headquartered at 2941 Lake Vista Dr., Lewisville, TX 75067.

18.     With over 34,000 participants and with nearly $700 million in assets under management as of December 31, 2023, the Plan is one of the largest retirement plans in the country. Throughout the class period the plan was always larger than 99.95% of defined contribution plans in terms of both the number of participants and  the value of its assets.

19.     Caliber is a privately held company that does not file publicly available financial disclosures, but Caliber has self-reported through its website and other advertisements billions of dollars in revenue during the class period, including $5.7 billion in annual revenue as of 2022 and the completion of an over $1.25 billion secured notes offering in 2024.

20.     Caliber fulfilled two distinct roles for the Plan: (1) Plan's sponsor (settlor or employer) under 29 U.S.C. § 1002(16)(B); and (2) Plan Administrator under 29 U.S.C. § 1002(16)(A) with broad authority over the administration and management of the Plan. ("Administrator" or "Caliber Plan Fiduciaries").

21.     The defendants sued by the fictitious names DOES 1 through 10, inclusive, are Plan fiduciaries unknown to Plaintiff who exercise or exercised discretionary authority or discretionary control respecting the management or disposition of its assets, or have had discretionary authority or discretionary responsibility in the administration of the Plan and are responsible or liable in some manner for the conduct alleged in the complaint. Plaintiff will amend this complaint to allege the true names and capacities of such fictitiously named defendants when they are ascertained.

## ERISA'S PURPOSE AS APPLIED TO DEFINED CONTRIBUTION PLANS

22.     ERISA exists, in large part, to protect the interests of participants, and their beneficiaries, in employee retirement plans. *See Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004) (citing 29 U.S.C. § 1001(b)).

23.     Over the past several decades defined contribution plans, like the Caliber Plan, have become the primary savings vehicle for most Americans. By 2022, there were more than 121 million participants who were relying on benefits from defined contribution plans to provide some or all of their retirement benefits. *See* https://www.congress.gov/crs-product/R48470; *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 255 (2008) ("Defined contribution plans dominate the retirement plan scene today.").

24.     Defined contribution plans allow employees to defer the payment of taxes on compensation contributed to the Plan. As a result, there are many IRS rules and regulations that define the requirements a plan must follow in order to receive the benefit of deferring taxes on contributions. To the extent that employers agree to make contributions to defined contribution plans, the employers also receive a tax benefit.

25.     A defined contribution plan "provides for an individual account for each participant and for benefits solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeiture of accounts of other participants which may be allocated to such participant's account." 29 U.S.C. § 1002(34). As such, a participant's retirement account in a defined contribution plan equals (1) the amount of the participant's voluntary contributions; plus (2) the amount of any employer contributions; plus (3) any investment returns on those contributions; minus (4) plan and investment expenses paid to third-party service providers. *Cunningham v. Cornell Univ.*, 604 U.S. 693, 697-98 (2025) (explaining that defined contribution

6

participants "maintain individual investment accounts within those plans, the value of which is determined by the market performance of employee and employer contributions, less expenses. Those expenses include fees paid to service providers.").

26.     In addition, employers, like Caliber, also derive many other indirect benefits by virtue of sponsoring defined contribution plans. For example, in addition to tax benefits, retirement plans are critical tools for employers to attract and retain high quality employees. That is why plan sponsors rarely terminate plans or eliminate contributions to their plans, because doing so would put them at a substantial competitive disadvantage and make it much more difficult to attract and retain talented employees

27.     As relevant to this case, under the circumstances prevailing well prior to the class period, it was and is understood that it is in the best interest of plan participants to enable them to participate in the potential for market earnings sooner rather than later. That general understanding applies to both contributions from employees as well as the allocation of forfeited plan assets and employer contributions.

28.     For example, ERISA and DOL regulations reflect a clear and longstanding policy intent to ensure that contributions of Plan participants are promptly invested pursuant to the direction of each Plan participant and are not allowed to sit indefinitely in unallocated plan-level accounts, which are typically invested in cash or a cash equivalent thereby depriving plan participants from the potential for investment earnings. *See, e.g.*, DOL Advisory Opinion 2002-02A (requiring that plan fiduciaries minimize the time between employee deferrals and investment pursuant to plan participant direction); see also 29 C.F.R. § 2510.3-102 (noting that plan assets "include participant contributions as of the earliest date they can reasonably be segregated" from the

7

employer's general assets); DOL Field Assistance Bulletin 2008-01 (noting that participant contributions "that are withheld from wages or paid to the employer are delinquent if they become plan assets while still in the hands of the employer").[1]

29.     Additionally, as relevant to this case, under the circumstances prevailing well prior to the class period, it was and is understood that plan expenses can have a dramatic detrimental impact on the retirement benefits provided by defined contribution plans. For example, according to the U.S. Department of Labor, a 1% difference in fees over the course of a 35-year career makes a difference of 28% in savings at retirement.[2] Over a 40-year career, this difference in fees can reduce a participant's retirement savings by almost $500,000.[3]

30.     Accordingly, participants are better off when their plan expenses are defrayed on an ongoing basis as the expenses are due and incurred. Thus, defraying plan expenses with forfeited plan assets as they occur provides an additional benefit to plan participants when evaluated

---

[1] *See also*, IRS "Retirement News for Employers," Vol. 7, Spring 2010 (stating forfeitures "must be used or allocated in the plan year incurred. The Code does not authorize forfeiture suspense accounts to hold unallocated monies beyond the plan year in which they arise."); 29 C.F.R. § 2510.3-102 (61 Fed. Reg. 41220, Aug. 7 1996) (noting that "the Department is concerned that participant contributions be paid promptly into the plan so as to begin to earn interest or other investment returns and to be available for the payment of benefits."); Field Assistance Bulletin No. 2002-03 (noting concern about interest earned "on contributions pending investment direction" and requiring that float be "regarded by plan fiduciaries and service providers as part of the service provider's compensation"). Accordingly, interest (float) earned on Forfeited Plan Assets sitting in an unallocated plan-level account both inures to the benefit of the employer when the plan fiduciaries use that interest (float) to reduce the employer's contributions and also deprives plan participants of the potential for investment earnings.

[2]     U.S. Dept. of Labor *A Look at 401(k) Plan Fees,* at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/401k-plan-fees.pdf.

[3] Michael Bird, *Pandemic Highlights Reasons for Reviewing Plan Fees,* PLANSPONSOR, May 15, 2020, https://www.plansponsor.com/pandemic-highlights-reasons-reviewing-plan-fees/, *archived at*https://perma.cc/8VCU-E7PC.

8

*solely* in the interest of plan participants and for the exclusive purpose of providing benefits *and* defraying plan expenses (*see* discussion below).

## ERISA FIDICIARY STANDARDS

31.     ERISA imposes strict duties of loyalty and prudence upon fiduciaries of retirement plans, like the Caliber Plan, that are covered by ERISA.

32.     Defendants are required by ERISA to: "discharge [their] duties with respect to a plan *solely* in the interest of the participants and beneficiaries and –  (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(A), (B) (emphasis added).

33.     ERISA explicitly requires plan fiduciaries to discharge their duties "solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

34.     ERISA's fiduciary duties are the "highest known to the law," *Bussian v. RJR Nabisco, Inc.,* 223 F. 3d 286, 294 (5th Cir. 2000); *Chao v. Merino*, 452 F.3d 174, 182 (2d Cir. 2006).

35.     "[C]onflicts of interest can violate ERISA's loyalty requirement." *Pilkington PLC v. Perelman*, 72 F.3d 1396, 1401 (9th Cir. 1995).

36.     The duty of prudence imposed by 29 U.S.C. § 1104(a)(1) focuses on the thoroughness of a fiduciary's investigation before making a decision and asks "whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular" decision. *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 107 (2d Cir. 2021); *Main v. Am. Airlines Inc.*, 248 F. Supp. 3d

9

786, 793 (N.D. Tex. 2017) ("The prudence standard normally focuses on the fiduciary's conduct in making investment decisions, and not on the results.").

37.     A fiduciary's decision-making process is always evaluated based on "the circumstances then prevailing", *i.e.,* the facts the fiduciaries knew at the time or should have known had they employed a prudent process.  29 U.S.C. § 1104(a)(1)(B).

38.     "[A] claim for breach of the duty of prudence will survive a motion to dismiss if the court, based on circumstantial factual allegations, may reasonably infer from what is alleged that the process was flawed or that an adequate investigation would have revealed to a reasonable fiduciary that the investment at issue was improvident." *Sacerdote,* 9 F.4th at 108.

39.     Additionally, ERISA makes explicit that the fiduciary duties set forth above cannot be overridden by plan terms, stating that fiduciaries must follow plan terms *only* "insofar" as they are  "consistent with the provisions of this subchapter and subchapter III." 29 U.S.C. § 1104 (a)(1)(D).

40.     The Supreme Court warns ERISA fiduciaries that they are not immunized from their duties to plan participants when they purport to adhere to a plan document. *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 421 (2014) (explaining that compliance with a plan document does not necessarily mean a fiduciary has discharged its duties with the prudence required under ERISA).

41.     ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for, among other things, knowingly participating in a breach by another fiduciary or enables breaches by other fiduciaries.

42.     Under ERISA, a person is a fiduciary to the extent he or she: (1) exercises any discretionary authority or control over management of the Plan or the management or disposition

10

of its assets; (2) renders investment advice regarding Plan assets for a fee or other direct compensation, or has the authority or responsibility to do so; or (3) has any discretionary authority or control over Plan administration. ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

43.     Employers, like Caliber, "who sponsor ERISA plans wear 'two hats,' acting as an employer and plan sponsor when they engage in settlor functions such as establishing, funding, amending, or terminating the plan, and acting as a fiduciary when they administer or manage the plan." *Humana Health Plan. Inc. v. Nguyen*, No. H-13-1793, 2016 U.S. Dist. LEXIS 121098, at *28 (S.D. Tex. Sep. 8, 2016). Additionally, ERISA requires, "the fiduciary with two hats wear only one at a time, and wear the fiduciary hat when making fiduciary decisions." *Pegram v. Herdrich*, 530 U.S. 211, 225 (2000).

44.     Accordingly, the Caliber Plan Fiduciaries are fiduciaries because they are the Plan's Administrator (named fiduciary), vested with authority to manage and administer the Plan, and because they exercised discretionary authority with respect to allocating Plan forfeitures at issue here.

45.     Caliber is also a fiduciary because it appointed the Plan Administrator (Caliber Plan Fiduciaries) and had a duty to monitor those fiduciaries.

46.     Caliber is a party-in-interest because it is an employer "any of whose employees are covered by such plan." *Id.*, § 1002(14)(C).

47.     Because Defendants are fiduciaries of the Plan and "deal[t] with the assets of the plan in [their] own interest or for [their] own account," they violated the fiduciary duty of loyalty and engaged in prohibited transactions under both 29 U.S.C. § 1106(a)(1)(D) and 29 U.S.C. § 1106(b)(1), by benefiting themselves as far as reducing their own future contributions to the Caliber Plan, making it unnecessary to take money out of their corporate revenues to support the Plan.

11

## FACTS APPLICABLE TO ALL COUNTS[4]

### A. The Plan

48.     The Plan is a defined contribution plan pursuant to 29 U.S.C. §§ 1002(2)(A) and (34) and was created by Caliber for the sole benefit of its eligible employees.

49.     The Plan was created and funded several years prior to the class period.

50.     In accordance with 29 U.S.C. § 1103(a), the assets of the Plan are held in a trust fund "for the purpose of holding the assets of and funding the benefits provided by the Plan."

51.     The Plan's operating documents provide that assets of the Plan should not be "used for, or diverted to, purposes other than the exclusive benefit of participants or their beneficiaries and for defraying reasonable expenses of administering the Plan."

52.     As an individual account, defined contribution retirement plan, a participant's retirement benefit in the Plan equals (1) the amount of the participants' voluntary contributions; *plus* (2) the amount of any employer contributions; *plus* (3) any investment returns on those contributions; *minus* (4) plan and investment expenses.

53.     As the employer and sponsor of the plan (also known as the settlor as that meaning is understood from trust law and used by the DOL in guidance), Caliber drafted and amended the Plan and intended it comply with the requirements of ERISA and the Internal Revenue Code of 1986, as amended.

---

[4] Unless otherwise specified, the facts specific to the Plan in this section are taken from: (1) documents provided by Defendants to Plaintiff's counsel, including the Plan's operative governing documents during the class period; (2) Plaintiff's Plan documents; (3) the Plan's Form 5500s filed by Defendants with the Department of Labor and publicly available through the "DOL's" website at https://www.efast.dol.gov/5500Search/; and (4) other publicly available information about the Plan.

## B. Relevant Plan Terms

### *Eligibility*

54.     In general, all employees are eligible to participate in the Plan.

### *Caliber Mandatory Contributions*

55.     There are several types of contributions that can be added to a Plan participant's account, including: (1) Employee Contributions; (2) Employer Matching Contributions; (3) Employer Discretionary Nonelective Contributions; and (4) Rollover Contributions.

56.     Relevant to this case, declared Employer Matching Contributions under the terms of the Plan (hereafter "Caliber Matching Contributions") means a fixed or discretionary contribution the Employer makes on account of Elective Deferrals under a 401(k) Plan, 403(b) Plan, or on account of Employee Contributions.

57.     All Caliber Matching Contributions were subject to notice provisions. For example, the Plan specifically states that "For any Plan Year beginning after the Plan Year the Employer signs its Adoption Agreement, if the Employer makes a Flexible Discretionary Match to the Plan, the Employer must provide the Plan Administrator (or Trustee, if applicable), written instructions describing (1) how the Flexible Discretionary Match Formula be allocated to Participants (e.g., a uniform percentage of Elective Deferrals or a flat dollar amount), (2) the computation period(s) to which the flexible Discretionary Match Formula applies, and (3) if applicable a description of each business location or business classification subject to separate Flexible Discretionary Match Formulas. Such instructions must be provided no later than the date on which the Flexible Discretionary Match is made to the Plan.  A summary of these instructions must be communicated to Participants who receive an allocation of the Flexible Discretionary Match no later than 60

13

days following the date on which the last Flexible Discretionary Match is made to the Plan for the Plan Year."

58.    During the class period, Caliber reported to the DOL in the Plan's annual Form 5500s that in its settlor capacity it did not declare Employer Discretionary Nonelective Contributions.

59.    During the class period, Caliber reported to the DOL in the Plan's annual Form 5500s that in its settlor capacity it "elected a Company match" (Caliber Matching Contributions) in every year between 30-50% of participant deferrals up to 6% of eligible compensation.

60.    Once Caliber makes an election to provide Caliber Matching Contributions and provides notice, it is obligated to fund the full amount of its Caliber Matching Contributions without regard for any Forfeited Plan Assets that may be used to offset the amount of the Caliber Matching Contributions. Caliber remains obligated to make those Caliber Matching Contributions until Caliber either suspends them (as it did on April 1, 2020) or provides notice changing the amount of the Caliber Matching Contributions.

61.    Moreover, as a matter of practice Caliber made Caliber Matching Contributions on a payroll basis. Once those Caliber Matching Contributions were made to Plan participants, Caliber could not require those Caliber Matching Contributions to be taken out of the Plan and returned to Caliber's corporate accounts.

62.    Accordingly, it is apparent that Caliber Matching Contributions were made without any regard to the amount of Forfeited Plan Assets available to offset those amounts since the formula was provided to the Plan Administrator prior to the ability to calculate the amount of Forfeited Plan Assets that might be available to offset those Caliber Matching Contributions.

14

63.     Throughout the class period, all these various types of contributions have been deposited into the Plan's trust fund and allocated to individual participant accounts.

64.     Caliber must pay all declared Caliber Matching Contributions that have accrued throughout a calendar year to the Plan trustee within a reasonable period of time after the end of the prior calendar year.

65.     In every year during the class period, Caliber declared Caliber Matching Contributions and thus became contractually obligated to make Caliber Matching Contributions to the Plan.

66.     Upon their deposit into the Plan's trust fund, all participant contributions and Caliber Matching Contributions become assets of the Plan.

### *Vesting and Forfeiture of Caliber Matching Contributions*

67.     Under the terms of the Plan, participants are immediately vested in their own contributions, as well as any actual earnings thereon. Participants generally are not 100% vested in declared Caliber Matching Contributions (and any actual earnings on such amounts) until the completion of three years of employment.

68.     To the extent a participant is not 100% vested upon termination of employment, the participant forfeits the value of Caliber contributions and any actual earnings thereon (hereafter "Forfeited Plan Assets") in his or her account on the earlier of the date the participant takes a distribution of his or her vested interest in the Plan or the date the participant incurs a five-consecutive-year break in vesting service (within the meaning of the Plan document).

69.     The Plan instructs the Caliber Plan Fiduciaries that any Forfeited Plan Assets arising under the Plan for a given Plan Year and earnings thereon must be used to offset employer contributions or pay reasonable Plan expenses.

15

70.    Earlier versions of the Plan during the class period may require Forfeited Plan Assets to first be used to offset declared Caliber Matching Contributions as the most current Plan Form 5500 states that "Forfeitures are retained in the Plan and may first be used to pay administrative expenses. Any remaining amounts will be used to reduce future employer contributions payable under the Plan."  However, Caliber did not provide Plaintiff with earlier versions of the Plan. If discovery confirms that earlier versions of the Plan required Forfeited Plan Assets to first be used to offset Plan Expenses, Plaintiff will amend the complaint to include an additional claim for failure to follow the Plan's terms pursuant to 29 U.S.C. 1104(a)(1)(D).

***Plan Administration***

71.    Throughout the class period, the Plan incurred plan expenses through paying third-party service providers both direct and indirect compensation to provide services to the Plan. Hereafter the payment of Plan assets for services shall collectively be referred to as "Plan Expenses."[5]

72.    Based on Caliber's disclosures to the DOL throughout the class period, the Plan paid Plan Expenses to, at a minimum, Prudential Retirement, Transamerica Retirement Solutions, Sageview Advisory Group, Baker Tilly Virchow Krause, L Scott Austin, Crowe LLP, Empower Annuity Ins Co., and CapFinancial Partners to provide services to administer the Plan ranging from, among others, recordkeeping and information management, administration, account maintenance, loan processing, claims processing, accounting (including auditing), contract administrator, consulting, participant communication, and investment management. For example, the Plan

---

[5] The amount of Plan Expenses specifically identified in this Amended Complaint likely understate the actual Plan Expenses paid by Plan participants because the amounts do not include undisclosed indirect compensation paid by Plan participants.

disclosed to the DOL that Transamerica received $1,566,742 from Plan assets in direct compensation in 2023 as well as an undisclosed amount of indirect compensation.

73.    The use of Plan assets to pay Plan Expenses reduces the funds available to Plan participants for distribution and/or investing—and thereby reduces the value of individual participant accounts—and deprives the Plan of funds that otherwise would have been earned on the amounts deducted.

## THE CALIBER PLAN FIDUCIARIES IMPRUDENT AND DISLOYAL ALLOCATION OF FORFEITED PLAN ASSETS

### A. The Caliber Plan Fiduciaries Use of Forfeited Plan Assets During the Class Period

74.    The Plan's Form 5500s, which are filed with the Department of Labor for each Plan year and publicly available, detail the amount Caliber declared in Caliber Matching Contributions, the amount of Forfeited Plan Assets used to offset Caliber's declared Caliber Matching Contributions, and the amount of Forfeited Plan Assets used to defray Plan Expenses. The Plan's Form 5500s for a given plan year are typically filed in the fall of the next calendar year. As discussed below, key information was left out of the Plan's 2023 Form 5500.

75.    From 2019 through 2024, Caliber, in its settlor capacity, declared and became obligated under the Plan to make Caliber Matching Contributions to the Plan in the following amounts: (1) in 2019, at least $12,271,649[6]; (2) in 2020, at least $5,436,222; (3) in 2021, at least $13,600,634; (4) in 2022, at least $23,132,668; (5) in 2023, at least $28,343,060; and (6) in 2024, at least $50,118,389

---

[6] Derived from the Plan's 2019-2024 Forms 5500s. For 2019, the figure was derived from Caliber Collision's disclosed contribution amount net of forfeitures of $11,650,015 plus $621,634 of Forfeited Plan Assets that were used to reduce Employer Contributions. This methodology was used for each subsequent year.

76.    From 2019 through 2024 (2023 was not reported), the Caliber Plan Fiduciaries were required under the terms of the Plan and ERISA to direct the use of Forfeited Plan Assets in the following minimum amounts: (1) in 2019, approximately $1,256,257[7]; (2) in 2020, approximately $1,928,415; (3) in 2021, approximately $1,731,481; (4) in 2022, $1,559,726; and (5) in 2024, $3,705,916.

77.    From 2019 through 2024 (2023 was not reported), the Caliber Plan Fiduciaries decided to offset Caliber's obligation to make declared Caliber Matching Contributions by allocating Forfeited Plan Assets in the following amounts: (1) in 2019, $621,634; (2) in 2020, $625,248; (3) in 2021, $1,499,053; (4) in 2022, $1,362,338; and (5) in 2024, $3,487,638. These actions saved Caliber the respective amounts, which flowed directly to its bottom-line profit.

78.    From 2019 through 2024, the Caliber Plan Fiduciaries caused Plan participants to pay Plan Expenses through deductions from their accounts and indirectly through revenue sharing or similar methods. The minimum direct amounts paid by participants were: (1) in 2019, $1,197,846; (2) in 2020, $1,291,101; (3) in 2021, $1,409,746; (4) in 2022, $1,305,257; (5) in 2023, $1,664,834; and (6) in 2024, $1,324,270.[8]

79.    ERISA requires Caliber Plan Fiduciaries to use Forfeited Plan Assets to provide benefits and defray Plan Expenses as soon as administratively practicable. As of December 31, each year from 2019 through 2024, unallocated Forfeited Plan Assets remained unused in the

---

[7] Derived from the Plan's 2019-2024 Forms 5500s. For 2019, the amount of $1,256,257 represents the $622,134 of Forfeited Plan Assets that were used during the year plus the $634,123 in unallocated Forfeited Plan Assets in the plan on December 31, 2019. This methodology was used for each subsequent year.

[8] The amount of Plan Expenses specifically identified in this Complaint understates the actual Plan Expenses paid by Plan Participants because the amounts do not include undisclosed indirect compensation paid by Plan Participants. For example, the Plan participants paid at least $332,274 in Plan Expenses through indirect compensation throughout the class period.

18

following amounts: (1) in 2019, $634,123; (2) in 2020, $1,191,429; (3) in 2021, $232,428; (4) in 2022, $197,388; (5) in 2023, $451,759; and (6) in 2024, $150,688. At all times during the class period it was administratively feasible to use Forfeited Plan Assets to provide retirement benefits and pay Plan Expenses and avoid carrying these amounts in an unallocated plan account over to the next calendar year.

80.    From 2019 through 2024 (2023 was not reported), the Plan Fiduciaries only used $179,828 to defray Plan Expenses out of over $10 million in Forfeited Plan Assets available for direction by the Plan Fiduciaries.

81.    In other words, throughout the class period Defendants used less than 2% of the Forfeited Plan Assets available for direction to defray Plan Expenses. A prudent and loyal fiduciary presented with this scenario, would not have applied millions of dollars to offset future company contributions and left millions of dollars unused each year when Plan participants shouldered millions of dollars in administrative expenses. These actions by the fiduciaries, at a minimum, necessitate the inference that imprudence or disloyalty was at play in their decision-making process.

82.    The Plan's 2023 Form 5500 did not disclose the amount of Forfeited Plan Assets Caliber used to offset its required declared Caliber Matching Contributions, but, upon information and belief, the amount of unallocated Forfeited Plan Assets for calendar year 2023 was substantially similar to other years and that in all years of the class period the Plan Fiduciaries again exercised discretion over, and control of, Plan assets by failing to use the unallocated Forfeited Plan Assets to pay Plan Expenses or to allocate the Forfeited Plan Assets back to eligible participants in accordance with a definite formula defined in the Plan. In fact, the Plan's 2024 Form 5500 shows that the Caliber Plan Fiduciaries are actually accelerating their use of Forfeited

Plan Assets to offset declared Caliber Matching Contributions and continuing to only use a tiny fraction to defray Plan Expenses and leaving hundreds of thousands of dollars in unallocated Forfeited Plan Assets at the end of the year.

83.     The following chart demonstrates the Plan Fiduciaries' disloyal and conflicted use of forfeitures during the class period:

| YEAR | MINIMUM FORFEITURES USED TO OFFSET CALIBER CONTRIBUTIONS | FORFEITURES USED FOR PLAN ADMIN EXPENSES | MINIMUM EXPENSES PAID BY THE PLAN AND PARTICIPANTS | FORFEITURES BALANCE AT YEAR END LEFT IN UNALLOCATED ACCOUNT |
|---|---|---|---|---|
| 2019 | $621,634 | $500 | $1,197,846 | $634,123 |
| 2020 | $634,123 | $111,738 | $1,291,101 | $1,191,429 |
| 2021 | $1,499,053 | $0 | $1,409,746 | $232,428 |
| 2022 | $1,362,338 | $0 | $1,305,257 | $197,388 |
| 2023 | Not Reported | Not Reported | $1,664,834 | $451,759 |
| 2024 | $3,487,638 | $67,590 | $1,324,270 | $150,688 |
| **Total** | **$7,595,911** | **$179,828** | **$8,193,054** | **$2,857,815** |

84.     Upon information and belief, the Caliber Plan Fiduciaries have continued to violate ERISA in their use of Forfeited Plan Assets.

**B. ERISA's Duty of Prudence as Applied to Forfeited Plan Assets**

85.     Well prior to the class period, like all prudent defined contribution plan fiduciaries and plan sponsor/employers/settlors, the Caliber Plan Fiduciaries knew that a defined contribution "plan will not be qualified unless all funds are allocated to participants' accounts in

20

accordance with a definite formula in the plan." *See also*, IRS "Retirement News for Employers," Vol. 7, at 4, Spring 2010 (citing to IRS Revenue Ruling 80-155).

86. Similarly, all prudent defined contribution plan fiduciaries and employers knew that to ensure their plans remained qualified under the IRS Code, there were only a few allowable uses of forfeited plan assets, primary among them being to defray plan expenses or reduce employer contributions. *Id*.

87. Accordingly, when designing their plan, employers had a few limited options to choose from with respect to the treatment of forfeited plan assets. Employers that wanted all forfeited plan assets to be used first to reduce employer contributions prior to defraying plan expenses could have drafted the terms of the plan to explicitly require that (as some did).

88. Indeed, during the class period, several other large plan sponsors drafted their plans to specifically require forfeited plan assets to be used to offset the employer's matching and discretionary contributions before being used to defray plan expenses, while others even prohibited using forfeited plan assets to defray plan expenses.

89. On the opposite end of the spectrum, some plans preclude or limit forfeited plan assets from being used to reduce employer contributions.

90. In between these two poles are plans—like the Plan here—that accord discretion to their fiduciaries to use forfeited plan assets either to defray plan expenses or to offset employer contributions. In those instances, plan fiduciaries, as with any exercise of discretion over the use of plan assets, must use a prudent process to determine which of the allowable uses of forfeited plan assets would be consistent with their fiduciary duties.

91. A plan fiduciary that exercises discretion to use forfeited plan assets to defray plan expenses is not providing a benefit greater than what was required or intended by the plan

sponsor/employer (settlor). Rather, plans that grant discretion to plan fiduciaries to choose among multiple different options for allocating forfeited plan assets, including to defray plan expenses, necessarily contemplate that plan expenses will be defrayed if doing so accords with ERISA's fiduciary standards. As noted above, employers were always aware that they could design the plan to prevent the use of Forfeited Plan Asset to defray plan expenses.[9]

92.    Critically, when a plan sponsor/employer makes a decision to make a discretionary contribution, it is acting as a settlor and not in a fiduciary capacity with respect to the plan, and is therefore free to prioritize its own interests over those of the plan and its participants.

93.    In contrast, a plan fiduciary making fiduciary decisions based on the discretion granted by the plan sponsor/employer is explicitly prohibited by ERISA from considering the interest of the employer.

94.    There is no dispute that under the terms of the Plan, defraying Plan Expenses is an allowable use of Forfeited Plan Assets.

95.    The terms of the Plan require the Caliber Plan Fiduciaries to exercise its discretion related to the use of Forfeited Plan Assets and determine whether defraying Plan Expenses was more consistent with its duties under the Plan and ERISA than using Forfeited Plan Assets to offset Caliber Matching Contributions.

96.    Accordingly, throughout the entire class period, a prudent fiduciary as part of a prudent fiduciary process would have always considered whether using Forfeited Plan Assets to defray Plan Expenses was more consistent with their duties under the plan and ERISA than using Forfeited Plan Assets to offset declared Caliber Matching Contributions. As set forth in detail

---

[9] It is worth noting that it is a settlor function to decide whether or not to provide a discretionary match (unconstrained by any fiduciary duties to plan participants) whereas decisions regarding the use of forfeited plan assets are constrained by ERISA's fiduciary duties.

below, the facts and circumstances here support a finding that, throughout the class period, a prudent fiduciary of the Caliber Plan employing a prudent process would have chosen to use Forfeited Plan Assets to defray some or all Plan Expenses during the class period.

97.   Since at least August 1, 2023, the terms of the Plan provided that the "Employer will direct the Plan Administrator as to whether the Employer will pay any or all non-settlor reasonable Plan expenses or whether the Plan must bear the expense."

98.    Accordingly, at least once a year a prudent plan fiduciary would have coordinated with Caliber to determine how much, if any, of the "non-settlor reasonable Plan Expenses" Caliber would pay.

99.   After that determination, a prudent plan fiduciary would determine how the remaining Plan Expenses would be paid.

100.   That determination by the Plan Fiduciaries was required to be guided by ERISA's requirement that the determination would be made for the exclusive purpose of providing benefits *and* defraying plan expenses.  *See* ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

101.   A prudent independent and non-conflicted Plan Fiduciary would have no reason to fail to use forfeited plan assets to defray plan expenses when that was an allowable option under the terms of the Plan.

102.   Additionally, in its Retirement News for Employers Newsletter from Spring 2010, the IRS published an article entitled "*Fixing Common Plan Mistakes: Improper Forfeiture Suspense Accounts*," discussing IRS Publication 4278-B (2010), p4278.pdf (irs.gov).

103.   In pertinent part, that article states: "Forfeitures must be used or allocated in the plan year incurred. The Code does not authorize forfeiture suspense accounts to hold unallocated monies beyond the plan year in which they arise. Revenue Ruling 80-155 states that a defined

contribution plan will not be qualified unless all funds are allocated to participants' accounts in accordance with a definite formula defined in the plan. This would preclude a plan from carrying over Forfeited Plan Assets to subsequent plan years, as doing so would defy the rule requiring all monies in a defined contribution plan to be allocated annually to plan participants."

104.   The same article states that "[t]he plan document's terms should have provisions detailing how and when a plan will exhaust plan forfeitures. A plan's failure to use forfeitures in a timely manner denies plan participants additional benefits or reduced plan expenses."

105.   The IRS concludes that "this failure can be corrected by reallocating all forfeitures in the plan's forfeiture suspense account to all plan participants who should have received them had the forfeitures been allocated on time."

C.   **The Caliber Plan Fiduciaries' Breaches of the Duty of Prudence**

*Misallocation of Forfeited Plan Assets*

106.   ERISA's fiduciary duty of prudence is violated where, as here, the Caliber Plan Fiduciaries Committee faced with a decision each year in choosing between allocating Forfeited Plan Assets toward offsetting declared Caliber Matching Contributions or defraying Plan Expenses that would otherwise be borne by Plan participants, failed to conduct any investigation as to which choice would be in the best interest of the participants.

107.   If the Caliber Plan Fiduciaries had employed a prudent process every year immediately prior to and throughout the class period, the Caliber Plan Fiduciaries would have used the Forfeited Plan Assets to defray all or substantial amounts of Plan Expenses.[10]

---

[10] In other words, to the extent that the Forfeited Plan Assets exceeded the foreseeable future ongoing Plan Expenses of the Plan as evaluated *solely* in the interest of Plan participants and for the exclusive purpose of providing benefits to participants *and* defraying the Plan Expenses of the Plan, then the Forfeited Plan Assets can be used to offset the full amount of Caliber's declared

108. In fact, however, the Caliber Plan Fiduciaries allocated hardly any of the Forfeited Plan Assets to defray Plan Expenses.

109. In other words, after the Caliber made an independent election, without any reference to the amount of Forfeited Plan Assets, to provide Caliber Matching Contributions, the Caliber Plan Fiduciaries imprudently coordinated with Caliber and the Plan's recordkeeper to calculate how much of the Forfeited Plan Assets would be used to offset Caliber Matching Contributions, while still allowing Plan Expenses to be deducted from the accounts of Plan participants.

110. Because the Caliber Plan Fiduciaries always had the ability to defray Plan Expenses with Forfeited Plan Assets but hardly ever did (from 2019 through 2022 less than 3% of all available Forfeited Plan Assets were used for defraying Plan Expenses), it is reasonable to infer that the Caliber Plan Fiduciaries employed a flawed decision-making process or did not employ any process at all to determine how to allocate Forfeited Plan Assets.

111. The Caliber Plan Fiduciaries did not, for example, investigate whether there was any set of circumstances that would support a decision to reduce declared Caliber Matching Contributions prior to defraying Plan Expenses, and there are no facts or circumstances that could possibly make the Caliber Plan Fiduciaries' failure to use Forfeited Plan Assets to defray Plan Expenses prudent.

112. *First*, there is no indication that using Forfeited Plan Assets to offset declared Caliber Matching Contributions was necessary for Caliber to maintain their past contribution levels, as there are no facts or circumstances to suggest that Caliber's process in determining the amount of its declared Caliber Matching Contributions is based on any consideration of the amount of

Caliber Matching Contributions Defendants are solely in the possession of the documents that would be necessary to review and evaluate that determination.

Forfeited Plan Assets. In fact, just like all other companies that have discretionary company contribution provisions, every year throughout the class period, Caliber's decisions related to Caliber Matching Contributions were made without reference to the amount of Forfeited Plan Assets and were instead driven by the need to attract and retain talented employees.

113.    Companies like Caliber actually use their past benefit history to both attract new employees and promote to their existing employees the benefits provided by the plan design even if those benefits are discretionary.

114.    In other words, companies like Caliber use the amounts they have contributed as company contributions in prior years as part of their efforts to attract and retain talented employees in a competitive environment in which other companies are also competing with Caliber to attract and retain the same potential employees. Caliber's decision to elect to make Caliber Matching Contributions, and the amount of those declared Caliber Matching Contributions is based primarily on the competitive environment related to other companies that may compete for talented employees and is not made with any consideration of the amount of Forfeited Plan Assets held in (or expected to be held in) an unallocated plan account at the time the Caliber Matching Contributions are made (in this case for Employer Matching Contributions on a payroll basis).

115.    For example, in 2024 the amount of Plan Expenses that the Caliber Plan Fiduciaries caused Plan participants to pay through deductions from their Plan accounts comprised less than 3% of the $50,118,389 of Caliber Matching Contributions obligated to be contributed by Caliber.[11]

---

[11] Because Defendants failed to fully disclose information related to its use of Forfeited Plan Assets in 2023, Plaintiff is unable to provide information for the entire class period.

116.    In other words, the Plan Expenses are immaterial to both Caliber's decision to provide discretionary Caliber Matching Contributions and Employer Discretionary Nonelective Contributions as well as Caliber's financial results.

117.    While the Caliber Matching Contributions are initially discretionary Caliber makes the settlor decision about the amount of the Employer Matching Contributions in advance and makes the decision related to Employer Discretionary Nonelective Contributions sometime in the fourth quarter of the Plan year. Once these settlor decisions are made by Caliber, the Caliber Plan Fiduciaries know the exact amount of declared Caliber Matching Contributions and only make fiduciary decisions with respect to Plan assets based on the actual Caliber Matching Contributions declared by Caliber, *i.e.*, the circumstances then prevailing. Therefore, it is irrelevant for the Caliber Plan Fiduciaries' decision-making process with respect to the allocation of Forfeited Plan Assets that the Caliber Matching Contributions were ever once discretionary.

118.    ***Second***, other than in 2020 when Caliber suspended its Caliber Matching Contributions, there are no facts to suggest that Caliber would be unable to meet its future Caliber Matching Contributions obligations, such that using Forfeited Plan Assets to offset Caliber Matching Contributions was necessary because if there was, Caliber would have suspended its Caliber Matching Contributions like it did in 2020.

119.    Upon information and belief, Caliber was able to meet its future contributions throughout the class period and would have been able to meet its declared Caliber Matching Contributions each year, even if no Forfeited Plan Assets were applied to offset its contributions. In fact, from 2019-2023 Caliber had billions of dollars of revenues.

120.    Yet even if there was some indication that Caliber would be unable to meet future Caliber Matching Contributions obligations, a prudent fiduciary would only offset the amount

necessary to prevent Caliber from being unable to meet its future contributions, and then allocate the remaining funds to other more beneficial options, like reducing Plan Expenses shouldered by the Plan participants.

121.    For example, in 2020 after Caliber suspended its Caliber Matching Contributions, a prudent fiduciary would have conducted an investigation as to the use of the Forfeited Plan Assets that would accrue in the Plan throughout 2020. Yet, despite knowing that the Plan would continue to experience Plan Expenses, the Plan Fiduciaries did not choose to use the Forfeited Plan Assets for the other option available under the terms of the Plan.

122.    Consequently, an objective analysis of the available options throughout the class period, guided by ERISA's fiduciary duty of prudence would indisputably not result in Plan Fiduciaries choosing to use nearly all Forfeited Plan Assets available to offset future Caliber Matching Contributions year after year throughout the class period instead of using Forfeited Plan Assets to defray some or all Plan Expenses.

123.    Instead of acting prudently by using Forfeited Plan Assets to defray Plan Expenses charged to the individual accounts of Plan participants on an ongoing basis (or allocating the Forfeited Plan Assets to the accounts of eligible Plan participants if there was no other option available), the Caliber Plan Fiduciaries (based on the information provided in the Plan's incomplete Form 5500s) chose to use virtually all the Forfeited Plan Assets (more than 97%) for the purpose of offsetting Caliber's declared Caliber Matching Contributions to the Plan, thereby saving Caliber millions of dollars at the expense of the Plan.

124.    Prudent fiduciaries following a prudent process would not choose to offset Caliber's declared Caliber Matching Contributions instead of reducing the Plan participants' Plan

28

Expenses or, alternatively allocating the Forfeited Plan Assets back to the accounts of Plan participants to be used to defray Plan Expenses.

125.  The Caliber Plan Fiduciaries' conduct, at the very least, necessitates the inference that either it did not have processes in place to weigh the benefits to participants of allocating Forfeited Plan Assets or, alternatively, the process employed was fatally flawed.

### Failure to use Unallocated Forfeited Plan Assets

126.  The Caliber Plan Fiduciaries were required to monitor Forfeited Plan Assets and should have ensured that all Forfeited Plan Assets for the plan year were promptly exhausted by year end or shortly thereafter, and did not remain in an unallocated Plan account.

127.  Even though there were sufficient unallocated Forfeited Plan Assets to defray some or all of the Plan Expenses during each year of the class period, Caliber Plan Fiduciaries nevertheless chose to allow the unallocated Forfeited Plan Assets in each year to remain unused.

128.  A prudent fiduciary employing a prudent process would at a minimum of once a year, coordinate with the Plan's recordkeeper to determine the amount of unallocated Forfeited Plan Assets available. To the extent there were unallocated Forfeited Plan Assets, a prudent fiduciary would evaluate how to use the unallocated Forfeited Plan Assets solely in the interest of the participants and beneficiaries. *See* 29 U.S.C. § 1104(a)(1).

129.  The Caliber Plan Fiduciaries, following a prudent process, would not have allowed millions in Forfeited Plan Assets to accumulate in an unallocated plan level account when the Plan's terms give the Caliber Plan Fiduciaries the discretion to use Forfeited Plan Assets to defray Plan Expenses, especially when the amount of the Forfeited Plan Assets that remained at the end of each calendar year could substantially defray Plan Expenses during the class period.

130.    The Caliber Plan Fiduciaries did not, for example, investigate whether there was any set of circumstances that would support a decision to not use unallocated Forfeited Plan Assets to defray Plan Expenses and allow millions of Plan assets to go unused.

131.    In fact, as evidence of this imprudent conduct, effective April 1, 2020, the Company suspended its Caliber Matching Contributions. Throughout 2020 the Plan continued to gain Forfeited Plan Assets such that the Plan Fiduciaries had over $1.9M in Forfeited Plan Assets for which to provide direction. Despite knowing that Caliber had suspended its Caliber Matching Contributions and there was no guarantee that Caliber would reinstate its Caliber Matching Contributions, much less make any discretionary employer contributions, the Plan Fiduciaries allowed the Plan to end 2020 with over $1.9M in the unallocated plan level suspense account holding the Forfeited Plan Assets.

132.    The Caliber Plan Fiduciaries' repeated practice of failing to promptly allocate Forfeited Plan Assets show that the Caliber Plan Fiduciaries either had no prudent process in place to determine how to use Forfeited Plan Assets or, alternatively, employed a flawed process.

133.    The Caliber Plan Fiduciaries violated its fiduciary duty of prudence by not using unallocated Forfeited Plan Assets, thereby causing Plaintiff and other Plan participants to pay for millions in Plan Expenses that should have otherwise been defrayed.

C.    **The Caliber Plan Fiduciaries' Breaches of the Duty of Loyalty**

134.    Throughout the class period loyal fiduciaries were required to make decisions with respect to the allocation of Forfeited Plan Assets, "solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

135. As discussed above, the Caliber Plan Fiduciaries only used a tiny fraction of Forfeited Plan Assets to reduce the Plan's Expenses, and it appears that they used no Plan forfeitures to defray the Plan's Expenses from 2021-2023, which would have benefited the Plan's participants rather than Caliber.

136. Using Forfeited Plan Assets to reduce current and future employer contributions is always in the best interest of Caliber because that option decreases Caliber's own contribution costs and means that Caliber does not need to take money out of its own general revenues to pay for declared Caliber Matching Contributions.

137. There may possibly be a set of circumstances in which the option to reduce future employer contributions may be in the best interests of Plan participants when, *e.g.*, there is a risk that Caliber may be financially unable to satisfy its contribution obligations.

138. In fact, however, in the event that a plan sponsor was in a questionable financial situation, in most cases the plan sponsor would simply exercise their settlor discretion to not provide a discretionary match (like Caliber did for a short period during the class period) or simply amend their plan document to eliminate any company contributions.

139. Additionally, as described in more detail above, for large plan sponsors such as Caliber in this case, decisions related to Caliber Matching Contributions are made without regard to any current or expected amounts of Forfeited Plan Assets.

140. In any event, absent a risk that Caliber would be unable to satisfy its contribution obligations under the Caliber Plan, however, using Forfeited Plan Assets to defray Plan Expenses would be in the participants' best interest because that option would reduce or eliminate amounts otherwise charged to their accounts to cover such administrative expenses.

141.   In deciding between using the Forfeited Plan Assets to benefit Caliber or Plan participants, Caliber Plan Fiduciaries are presented with a conflict of interest in administering the Plan and managing and disposing of their assets.

142.   In using Forfeited Plan Assets almost exclusively to reduce its own employer contributions from 2019-2022, even though it was permitted to use those Forfeited Plan Assets to pay Plan Expenses for participants, Caliber, while acting in its fiduciary capacity as Caliber Plan Fiduciaries, was motivated solely by its settlor/employer self-interest and breached their duty of loyalty.

*************************

143.   To be clear, as described above, Plaintiff does not allege that ERISA prohibits fiduciaries from *ever* using Forfeited Plan Assets to offset company contributions. Rather, Plaintiff alleges that under the specific facts and context of this Plan—where the Caliber Plan Fiduciaries were accorded discretion by the Plan over how to allocate Forfeited Plan Assets—a prudent and loyal fiduciary would not make the decisions that the Caliber Plan Fiduciaries made (as alleged above). Here, under the circumstances described, it is reasonable to infer that the Caliber Plan Fiduciaries did not employ a prudent fiduciary decision-making process and thus breached their fiduciary duty of prudence. *See e.g., Sacerdote v. N.Y. Univ.,* 9 F.4th 95, 108-09 (2d Cir. 2021) ("[We] caution against overreliance on . . . other ERISA cases as benchmarks. While such comparisons may sometimes be instructive, their utility is limited because the assessment of any particular complaint is a context-specific task. We cannot rule out the possibility that a fiduciary has acted imprudently by including a particular fund even if, for example, the fees that fund charged are lower than a fee found not imprudent in another case.").

32

144. In summary, the totality of the specific facts and circumstances of the Plan and the conduct of the Caliber Plan Fiduciaries throughout the class period demonstrates that the Caliber Plan Fiduciaries failed to administer the Plan in a prudent and loyal manner.

## TRANSACTIONS PROHIBITED BY ERISA

145. ERISA's prohibited-transaction provisions impose "categorical" restrictions designed to protect plan assets from conflicted, insider transactions. *See Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 241–42 (2000).

146. Section 406(a) prohibits fiduciaries from causing a plan to engage in certain transactions with parties in interest, including any "transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1)(D).

147. Section 406(b) separately prohibits fiduciaries from "deal[ing] with the assets of the plan in [their] own interest," *id*. § 1106(b)(1), or "act[ing] in a transaction" involving plan assets "on behalf of a party… whose interests are adverse to the interests of the plan," *id*. § 1106(b)(2).

148. *Cunningham v. Cornell University*, 604 U.S. 693 (2025), reinforces that ERISA § 406(a) imposes "categorical" prohibitions on certain transactions and that plaintiffs need only plead the statutory elements of § 406(a)(1) to state a claim. *Id.* at 700.

149. *Cunningham* makes clear that § 1106(a)(1)'s prohibitions apply whenever a fiduciary causes a plan to engage in a transaction falling within the statutory language. Although *Cunningham* did not address the meaning of "use" under § 406(a)(1)(D) or the application of forfeitures to reduce employer contributions, those questions are resolved by the growing body of forfeiture-specific cases, many of which hold that a fiduciary "uses" plan assets for the employer's

benefit when it applies forfeitures to reduce employer contributions—even where no funds leave the plan trust.

150. When a fiduciary applies forfeitures in a manner that relieves the employer of a financial obligation, the fiduciary has engaged in a prohibited "use" of plan assets, even without a literal transfer of funds.

151. An employer's reallocation of undisputed plan assets to reduce its own matching contribution is a 'use' of plan assets for the purposes of § 1106(a)(1)(D). This is because allocating forfeitures to reduce employer contributions is not an internal bookkeeping measure—it is a disposition of plan assets that directly benefits the employer.

152. A party in interest includes an employer whose employees are covered by the plan. 29 U.S.C. § 1002(14)(C).

153. Caliber saved millions of dollars in employer contributions by using forfeitures to satisfy obligations it otherwise would have paid from corporate funds.

154. That is a direct "transfer to" or "use for the benefit of" a party in interest under § 406(a)(1)(D).

155. The allocation of forfeitures to reduce employer contributions necessarily reduces the employer's financial obligation to the Plan. Forfeiture allocation operates "between" the plan and employer because it alters the employer's contribution obligations, violates § 406(a)(1)(D).

156. Similarly, Section 406(b)(1) bars a fiduciary from "deal[ing] with the assets of the plan in his own interest," and § 406(b)(2) prohibits a fiduciary from acting for the benefit of a party adverse to participants. Plaintiff alleges that Caliber acted in both capacities—first, as fiduciary allocating forfeitures, and second, as employer who benefited directly from that allocation.

157.    A fiduciary breaches § 406(b) when it uses plan assets in a manner that relieves the employer of financial obligations.

158.    Because Caliber's allocation decisions relieved itself of substantial financial obligations while providing no corresponding benefit to Plan participants, prohibited self-dealing exists under § 406(b).

159.    Reducing employer contributions is not merely an "intra-plan transfer" and is a "transaction" under § 406.

160.    An intra-plan movement of assets constitutes a prohibited transaction if it: (1) involves plan assets; (2) benefits a party in interest or fiduciary; and (3) results from a fiduciary decision.

161.    Caliber caused plan assets to be used to reduce its own contribution obligations. That is "dealing with" and "using" plan assets in a manner § 406 squarely prohibits, and thus, Caliber engaged in transactions prohibited by both § 406(a) and § 406(b).

**DEFENDANTS ENGAGED IN SELF-DEALING AND CAUSED MANY PROHIBITED TRANSACTIONS IN VIOLATION OF ERISA**

162.    From 2019 through 2023, the Plan Fiduciaries caused, directed, and authorized tens of thousands of transactions, both directly extracting money from the accounts of Plan participants or indirectly by reducing the net value of investment options held by Participants in the Plan, causing Plan Participants to pay over $8 million directly for Plan Expenses as well as additional amounts indirectly to the Plan's third-party administrators that should have been covered fully or in part by Forfeited Plan Assets.

163.    These direct transactions are memorialized in Plan level accounting, *e.g.*, a trust report of the Plan. In this case the Plan Fiduciaries chose to use a non-transparent fee methodology to cover plan expenses to hide the plan expenses from plan participants by requiring the Plan's

Expenses to be paid from the total annual operating expenses of the Plan's investment options.  As a result, the Plan Fiduciaries caused the Plan to engage in thousands of transactions that resulted in a portion of the total annual operating expenses of the Plan's investment options to be paid by Plan participants to the managers of the Plan's investment options who, in turn, sent a portion of that revenue back to the Plan to be held in a plan level account and used to pay the Plan expenses directly (and indirectly as well-see below) to the Plan's service providers.

164.    Moreover, throughout at least a portion of the class period, Defendants directed and authorized Plan Participants to pay an indeterminable amount of indirect compensation for Plan Expenses. The amount of indirect compensation paid by Plan participants to cover Plan Expenses is not able to be calculated by the documents available to Plaintiff and is in the possession of the Defendants who have not provided that information to Plaintiff.

165.    Had the Defendants acted in accordance with the terms of the Plan document and ERISA the Defendants should have directed the use of Forfeited Plan Assets to defray the Plan Expenses that Defendants instead required Plan Participants to directly pay through transactions from their individual accounts or indirectly through the operating expense of the investment options in the Plan.

166.    Throughout the class period, Defendants also caused the Plan to engage in several transactions with Caliber, a party in interest, related to Caliber's contractual obligation to make declared Caliber Matching Contributions to the Plan. For each of these transactions, the Plan Fiduciaries coordinated with the third-party recordkeeper and Caliber to calculate how much Caliber could reduce its obligatory payment to the Plan by offsetting the full amount owed with the use of Forfeited Plan Assets.

167.    In each of these instances, Defendants caused the Plan to engage in a transaction with Caliber that directly resulted in a smaller amount of money being paid by Caliber into the Plan.

168.    In other words, several times throughout the class period the Plan Fiduciaries engaged in calculations for the express purpose of calculating how much money Caliber could save from its declared contractual obligation to the Plan by using Forfeited Plan Assets to offset the amount of Caliber's contribution.

169.    As noted above, each of these transactions are also memorialized in the Plan trust reports.  Each of these transactions then serves to provide the assets necessary to execute thousands of transactions to invest Caliber declared Caliber Matching Contributions and Forfeited Plan Assets pursuant to the investment instructions of Plan Participants.

170.    In other words, each of these transactions involves the receipt of Caliber declared Caliber Matching Contributions and calculations related to Forfeited Plan Assets to enable a combination of Forfeited Plan Assets and Caliber declared Caliber Matching Contributions to be combined for use in following the investment instructions of thousands of Plan Participants.

171.    In other words, throughout the class period, the Plan Fiduciaries engaged in the conduct of making calculations that caused the Plan to receive at least $7 million less in Caliber declared Caliber Matching Contributions than what Caliber was obligated to make and which increased Company profits by at least $7 million.

172.    Additionally, the Defendants caused the Plan to engage in these transactions with Caliber that constituted and resulted in the use of Forfeited Plan Assets for the direct and indirect benefit of Caliber, a party in interest and Plan fiduciary.

173.     Throughout the Class Period, by directing, authorizing, and causing several transactions with Caliber and tens of thousands of transactions with Plan Participants, Defendants dealt with the Forfeited Plan Assets in their own individual interest and in Caliber's interest by using Forfeited Plan Assets to offset Caliber's contractual obligations to the Plan.

174.     Throughout the Class Period, by directing, authorizing, and causing several transactions with Caliber and tens of thousands of transactions with Plan Participants, the individual Plan Fiduciaries acted in their individual capacity and as agents of a party in interest, *i.e.*, Caliber, whose interests are adverse to the Plan or Plan Participants.

175.     Throughout the Class Period, by directing, authorizing, and causing several transactions with Caliber and tens of thousands of transactions with Plan Participants, the individual Plan Fiduciaries received consideration for their own personal accounts from Caliber as a result of their control over the transactions described above with a party in interest, *i.e.*, Caliber, involving the Forfeited Plan Assets, that enabled Caliber to reduce its costs and increase its profits thereby benefiting each individual Plan Fiduciary.

## CLASS ACTION ALLEGATIONS

176.      ERISA authorizes any participant or beneficiary of the Plan to bring an action on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a). *See* 29 U.S.C. § 1132(a)(2).

177.     In acting in their representative capacity for the Plan, Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiff seeks to certify, and to be appointed as representative of, the following class:

> All participants and beneficiaries of the Caliber Holdings Corporation Retirement Savings Plan (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning September 4, 2019, and running through the date of judgment.

178.    The class includes over 30,000 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

179.    There are questions of law and fact common to this class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owed fiduciary duties to the Plan and took the actions and omissions alleged as the Plan and not as to any individual participant. Thus, common questions of law and fact include but are not limited to the following:

a.    Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

b.    Whether Defendants breached their fiduciary duties to the Plan with respect to their management and allocation of Forfeited Plan Assets;

c.    Whether Plan Fiduciaries engaged in prohibited transactions with Forfeited Plan Assets;

d.    What are the losses to the Plan resulting from each alleged breach of ERISA; and

e.    What Plan-wide equitable and other relief the Court should impose to remedy Defendants' alleged breaches.

f.    Did fiduciaries of the Plan violate the anti-inurement provision of ERISA by using Plan assets for their own benefit?

180.    Plaintiff's claims are typical of the claims of the class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiff was a participant during the time period at issue and all participants in the Plan were harmed by Defendants' misconduct.

181.    Plaintiff will adequately represent the class pursuant to Federal Rule of Civil Procedure 23(a)(4), because he was a participant in the Plan during the class period, has no interest that conflicts with the class, is committed to the vigorous representation of the class, and has engaged experienced and competent lawyers to represent the class.

182.    Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual

39

participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants concerning their discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

183.    Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

184.    Plaintiff's attorneys have substantial and varied experience in complex ERISA and class action litigation and will adequately represent the class.

**COUNT I**
**Breach of ERISA's Fiduciary Duty of Loyalty Under 29 U.S.C. 1104(a)(1)(A)**
**By the Caliber Plan Fiduciaries Regarding Allocation of Forfeited Plan Assets**

185.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

186.    When exercising discretion and control over Forfeited Plan Assets and using them to reduce Caliber's declared contributions, instead of defraying the reasonable costs of administering the Plan or allocating the Forfeited Plan Assets back to eligible Plan Participants, the Caliber Plan Fiduciaries considered the best interest of Caliber and ignored the Plan document as opposed to the best interest of participants, in violation of ERISA.

40

187. When improperly exercising discretion and control over Forfeited Plan Assets and failing to use them to defray the reasonable costs of administering the Plan or allocating them back to the accounts of eligible Plan Participants, the Caliber Plan Fiduciaries considered the best interests of Caliber, as opposed to Plan Participants, in violation of ERISA.

188. Each Caliber Plan Fiduciary knowingly participated in the breach of the other Caliber Plan Fiduciaries, knowing that such acts were a breach, enabled other Caliber Plan Fiduciaries to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Caliber Plan Fiduciaries and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Caliber Plan Fiduciary is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

189. Plaintiff and the class have suffered losses as a direct result of the Caliber Plan Fiduciaries' breach of their duty of loyalty.

190. Pursuant to 29 U.S.C. § 1109(a), the Caliber Plan Fiduciaries are liable to restore to the Plan all losses caused by their fiduciary breaches. In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

## <u>COUNT II</u>
### Breach of the Duty of Prudence Under 29 U.S.C. 1104(a)(1)(B)
### By the Caliber Plan Fiduciaries Regarding Allocation of Forfeited Plan Assets

191. Plaintiff realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

192. When exercising discretion and control over Forfeited Plan Assets and using them to reduce Caliber contributions, the Caliber Plan Fiduciaries failed to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like

41

character and with like aims, when those aims are to act *solely* in the interest of the Plan participants and beneficiaries and for the exclusive purpose of providing benefits to Plan participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of ERISA.

193. In deciding how to allocate Forfeited Plan Assets, the Caliber Plan Fiduciaries failed to undertake a reasoned and impartial decision-making process. Rather than investigate whether using Forfeited Plan Assets to defray Plan Expenses before offsetting Caliber Matching Contributions would have been better for Plan participants, the Caliber Plan Fiduciaries reflexively used Forfeited Plan Assets to reduce Caliber's own contribution expenses while only devoting 2% of Forfeited Plan Assets from Plan Years 2019-2022 toward Plan Expenses. The Caliber Plan Fiduciaries' imprudent process can be further inferred from the fact that, on information and belief, there was no risk of Caliber not making its Caliber Matching Contributions and no indication that Caliber's contribution levels were informed by the amount of Forfeited Plan Assets, and thus no benefit to participants from using Forfeited Plan Assets to offset Caliber Matching Contributions instead of to defray Plan Expenses.

194. By refusing to use Forfeited Plan Assets to eliminate the Plan Expenses charged to participant accounts, and instead deciding to use these Plan assets only to reduce Caliber's own contribution expenses, the Caliber Plan Fiduciaries caused participants to incur expense deductions from their individual accounts that would otherwise have been covered in whole or in part by utilizing the Forfeited Plan Assets to pay Plan Expenses.

195. The Caliber Plan Fiduciaries also failed to investigate whether allowing millions of dollars of Forfeited Plan Assets to sit in an unallocated plan account at the end of each year instead of using those amounts to defray Plan Expenses was in the interest of the Plan and its

participants. By instead allowing those Forfeited Plan Assets to remain unallocated, the Caliber Plan Fiduciaries caused the value of Plan Participants' individual accounts to decrease as a result of expense deductions that would otherwise have been defrayed in whole or in part by utilizing the Forfeited Plan Assets to pay Plan Expenses.

196. Had the Caliber Plan Fiduciaries conformed with the minimum standard of care required under ERISA, the Caliber Plan Fiduciaries would not have used Forfeited Plan Assets to solely reduce Caliber contributions.

197. Alternatively, had the Caliber Plan Fiduciaries conformed with the minimum standard of care required under ERISA, they would have used Forfeited Plan Assets to defray reasonable expenses of administering the Plan up to the amount of unallocated Forfeited Plan Assets.

198. Plaintiff has suffered losses as a direct result of the Caliber Plan Fiduciaries breach of their duty of prudence.

199. Pursuant to 29 U.S.C. § 1109(a), the Caliber Plan Fiduciaries are liable to restore to the Plan all losses caused by their fiduciary breaches. In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

## COUNT III
### Fiduciary Prohibited Transactions/ Self-Dealing with Forfeited Plan Assets Under 29 U.S.C. 1106(b) By Caliber Plan Fiduciaries

200. Plaintiff realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

201. 29 U.S.C. § 1106(b) provides that "[a] fiduciary with respect to a plan shall not (1) deal with the assets of the plan in his own interest or for his own account, (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent

43

a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."

202.    Defendants were and continue to be Plan Fiduciaries. In their management and control of Forfeited Plan Assets, Defendants caused the Plan to use Plan assets (Forfeited Plan Assets) to fund Caliber's contractual obligation to make declared Caliber Matching Contributions to the Plan. By allocating these Plan assets toward offsetting Caliber's declared Caliber Matching Contributions obligations, Defendants saved Caliber millions of dollars in declared and contractually obligated Caliber Matching Contributions expenses. Defendants therefore dealt with the assets of the Plan in their own interest or for Caliber's own account, in violation of 29 U.S.C. § 1106(b)(1).

203.    Additionally, or alternatively, Defendants in their individual capacity or as an agent of Defendant Caliber acted in a transaction involving the Plan on behalf of a party (Defendant Caliber) whose interests are adverse to the interests of the Plan and the interests of Plan Participants and their beneficiaries in violation of  29 U.S.C. § 1106(b)(2) and received consideration for their own personal accounts from parties dealing with the Plan in connection with transactions involving the assets of the Plan (Forfeited Plan Assets) in violation of 29 U.S.C. § 1106(b)(3) through the mechanism of receiving higher bonuses than they otherwise would have received.

204.    As a result of this prohibited conduct, Defendants caused the Plan and Plan Participants and class to suffer losses in the amount of the Plan assets that were substituted for declared Caliber Matching Contributions and lost earnings on those assets.

205.    Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the prohibited conduct alleged in this claim, to restore to the Plan all assets and profits obtained through the use of Plan assets and is subject to other equitable or remedial relief as appropriate.

**COUNT IV**
**Fiduciary Prohibited Transactions Benefiting Employer with**
**Forfeited Plan Assets under 29 U.S.C. 1106(a) by Caliber Plan Fiduciaries**

206.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

207.    29 U.S.C. § 1106(a)(1) provides that "[a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect. . . exchange. . . of any property between the plan and a party in interest . . . or use by or for the benefit of a party in interest, of any assets of the plan."

208.    Defendants are parties in interest, as that term is defined under 29 U.S.C. § 1002 (14), because they are Plan Fiduciaries and because Caliber is the employer of Plan Participants.

209.    The Plan's third-party administrators and other service providers are also parties in interest. *See Cunningham*, 145 S. Ct. at 1025 ("[ERISA], in turn defines a "party in interest"' to include various plan insiders, including the plan's administrator, sponsor, and its officers, as well as entities providing services to [the] plan.") (internal citations omitted).

210.    When Defendants elected to use Forfeited Plan Assets as a substitute for future employer contributions to the Plan, thereby saving Caliber millions of dollars in declared contribution expenses, Defendants caused the Plan to engage in transactions that constituted a direct or indirect exchange of existing Plan assets for future employer contributions and/or use of Plan assets by or for the benefit of a party in interest.

211.   As a result of these prohibited transactions, Defendants caused the Plan to suffer losses in the amount of the Forfeited Plan Assets that were not used to defray Plan Expenses and lost investment returns on those assets.

212.   Additionally, when Defendants elected to use Forfeited Plan Assets as a substitute for declared Caliber Matching Contributions to the Plan and not for Plan Expenses, Defendants caused the Plan to engage in prohibited transactions with the Plan's third-party administrator and other service providers for the payment of Plan Expenses from Plaintiff and all Plan Participants' individual accounts, both directly and indirectly, that were sent to the Plan's third-party administrators and other third party service providers and that should have been paid in part or full by the Forfeited Plan Assets.

## COUNT V
### Breach Of Erisa's Anti-Inurement Provision under 29 U.S.C. 1103(C)(1) by Caliber Plan Fiduciaries

213.   Plaintiff realleges and incorporates herein by reference each preceding paragraph of this Complaint as though fully set forth herein.

214.   Pursuant to 29 U.S.C. § 1103(c)(1), "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purpose of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan."

215.   The balance in a participant's accounts that a participant forfeits when incurring a break in service prior to full vesting of the Company's contributions to the participant's account is an asset of the Plan.

216.   By electing to utilize the majority of these Plan assets as a substitute for the Company's own future contributions to the Plan, thereby saving the Company millions of dollars in

46

contribution expenses, Defendants caused the assets of the plan to inure to the benefit of the employer and failed to defray reasonable expenses of the plan in violation of 29 U.S.C. § 1103(c)(1) and 29 U.S.C. § 1104(a)(1)(A).

217.   Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from violation of ERISA's anti-inurement provision as alleged in this claim and to restore to the Plan all profits secured through their use of Plan assets. In addition, Plaintiff is entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in the Prayer for Relief.

218.   Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

## **PRAYER FOR RELIEF**

For these reasons, Plaintiff, on behalf of the Plan and all similarly situated participants and beneficiaries, respectfully requests that the Court:

- Find and declare that Defendants breached their fiduciary duties, ERISA's anti-inurement provisions, and engaged in prohibited conduct and transactions as described above;
- Find and adjudge that Defendants are personally liable to make good to the Plan all losses to the Plan resulting from each violation of ERISA described above, and to otherwise restore the Plan to the position it would have occupied but for these violations;

- Order the disgorgement of all assets and profits secured by Defendants as a result of each violation of ERISA described above;

- Determine the method by which Plan losses under 29 U.S.C. §1109 should be calculated;

- Order Defendants to provide all accounting necessary to determine the amounts Defendants must make good to the Plan under 29 U.S.C. § 1109(a);

- Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

- Surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive, and/or in violation of ERISA;

- Certify the class, appoint Plaintiff as class representative, and appoint the Chirinos Law Firm PLLC, Kendall Law Group, PLLC, Bloom Legal LLC, Milberg Coleman Bryson  Phillips Grossman, PLLC as class counsel;

- Award to Plaintiff and the class their attorneys' fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

- Order the payment of interest to the extent it is allowed by law; and

- Grant other equitable or remedial relief as the Court deems appropriate.

December 1, 2025                                  Respectfully submitted,


                                                 /s/*Joe Kendall*
                                                 JOE KENDALL
                                                 Texas Bar No. 11260700
                                                 **KENDALL LAW GROUP, PLLC**
                                                 3811 Turtle Creek Blvd., Suite 825
                                                 Dallas, Texas 75219
                                                 Telephone: 214-744-3000
                                                 Facsimile: 214-744-3015
                                                 jkendall@kendalllawgroup.com

48

**CHIRINOS LAW FIRM PLLC**
Tulio D. Chirinos *(admitted pro hac vice)*
20283 State Road 7,
Boca Raton, FL 33498
Telephone: (561) 299-6334
tchirinos@chirinoslawfirm.com

**BLOOM LEGAL LLC**
Seth J. Bloom
Texas Bar No. 24094426
825 Girod Street, Suite A
New Orleans, Louisiana 70113
Telephone: (504) 599-9997
Email: sjb@bloomlegal.com

**MILBERG, PLLC**
Alexandr Rudenco *(admitted pro hac vice)*
800 S. Gay St., Suite 1100
Knoxville, TN 37929
Tel: (865) 247-0080
arudenco@milberg.com

***Attorneys for Plaintiff and Proposed Class***


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served on all counsel of record

on December 1, 2025 via CM/ECF, in accordance with the Federal Rules of Civil Procedure.

/s/ *Joe Kendall*
Joe Kendall

49